IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

TUANJA EDWARD ANDERSON,

    Petitioner,                  No. CIV S-05-1609 GEB KJM P

    vs.

ROSEANNE CAMPBELL, et al.,

    Respondent.                FINDINGS AND RECOMMENDATIONS

                            /

          Petitioner is a California prisoner proceeding pro se with an application for writ of habeas corpus under 28 U.S.C. § 2254. Petitioner is currently serving a sentence of forty-years-to-life in the California Department of Corrections and Rehabilitation (CDCR) for second degree murder.

          Petitioner requests habeas relief on four separate grounds: (1) his convictions were obtained by use of evidence that was obtained in an unconstitutional search and seizure; (2) he was denied effective assistance of counsel; (3) the trial court committed reversible error by denying petitioner's motion to modify the jury's verdict; and (4) his second degree murder conviction must be reversed, because it is not supported by substantial evidence. Pet. at 5-6.

/////

I. <u>Standard of Review</u>

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). Federal habeas corpus relief also is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (referenced herein in as "§ 2254(d)" or "AEDPA"). <u>See</u> <u>Ramirez v. Castro</u>, 365 F.3d 755, 773-75 (9th Cir. 2004) (Ninth Circuit affirmed lower court's grant of habeas relief under 28 U.S.C. § 2254 after determining that petitioner was in custody in violation of his Eighth Amendment rights and that § 2254(d) does not preclude relief); <u>see</u> also <u>Lockyer v. Andrade</u>, 538 U.S. 63, 70-71 (2003) (Supreme Court found relief precluded under § 2254(d) and therefore did not address the merits of petitioner's Eighth Amendment claim).[1] Courts are not required to address the merits of a particular claim, but may simply deny a habeas application on the ground that relief is precluded by 28 U.S.C. § 2254(d). <u>Lockyer</u>, 538 U.S. at 71 (overruling <u>Van Tran v. Lindsey</u>, 212 F.3d 1143, 1154-55 (9th Cir. 2000) in which the Ninth Circuit required district courts to review state court decisions for error before determining whether relief is precluded by

/////

---

[1] In <u>Bell v. Jarvis</u>, 236 F.3d 149, 162 (4th Cir. 2000), the Fourth Circuit Court of Appeals held in a § 2254 action that "any independent opinions we offer on the merits of constitutional claims will have no determinative effect in the case before us . . . At best, it is constitutional dicta." However, to the extent <u>Bell</u> stands for the proposition that a § 2254 petitioner may obtain relief simply by showing that § 2254(d) does not preclude his claim, this court disagrees. Title 28 U.S.C. § 2254(a) still requires that a habeas petitioner show that he is in custody in violation of the Constitution before he or she may obtain habeas relief. <u>See</u> <u>Lockyer</u>, 538 U.S. at 70-71; <u>Ramirez</u>, 365 F.3d at 773-75.

§ 2254(d)). It is the habeas petitioner's burden to show he is not precluded from obtaining relief by § 2254(d). See Woodford v. Visciotti, 537 U.S. 19, 25 (2002).

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are different. As the Supreme Court has explained:

> A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams [v. Taylor, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685, 694 (2002). A state court does not apply a rule different from the law set forth in Supreme Court cases, or unreasonably apply such law, if the state court simply fails to cite or fails to indicate an awareness of federal law. Early v. Packer, 537 U.S. 3, 8 (2002).

The court will look to the last reasoned state court decision in determining whether the law applied to a particular claim by the state courts was contrary to the law set forth in the cases of the United States Supreme Court or whether an unreasonable application of such law has occurred. Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002), cert. dismissed, 538 U.S. 919 (2003). Where the state court fails to give any reasoning whatsoever in support of the denial of a claim arising under Constitutional or federal law, the Ninth Circuit has held that this court must perform an independent review of the record to ascertain whether the state court decision was objectively unreasonable. Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). In other words, the court assumes the state court applied the correct law, and analyzes whether the decision of the state court was based on an objectively unreasonable application of that law.

/////

It is appropriate to look to lower federal court decisions to determine what law has been "clearly established" by the Supreme Court and the reasonableness of a particular application of that law. See Duhaime v. Ducharme, 200 F.3d 597, 598 (9th Cir. 1999).

II. Analysis

Petitioner's first claim is that his conviction was obtained pursuant to a search conducted in violation of the Fourth Amendment. Pet. at 4.[2] Where a state provides a full and fair opportunity to litigate a Fourth Amendment claim, a state prisoner can not be granted habeas relief on grounds that evidence obtained through an unconstitutional search and seizure was introduced at his trial. Stone v. Powell, 428 U.S. 465, 489-95 (1976). Petitioner fails to point to anything suggesting he was not provided a full and fair opportunity to litigate his Fourth Amendment claim in state court. See Pet. at 4, 8-25; see also Traverse. Therefore, his Fourth Amendment claim must be denied.

Petitioner also claims, in his second claim, he was denied effective assistance of counsel at trial in violation of the Sixth Amendment. Pet. at 4. While petitioner implies that he was convicted because his attorney was not replaced by the trial court, id. at 4; cf. Pet., Part 2 at 7-26, he does not allege anything suggesting trial counsel's performance fell below an objective standard of reasonableness or that counsel in any way prejudiced petitioner's case. See Strickland v. Washington, 466 U.S. 668 (1984). Therefore, petitioner is precluded from obtaining relief on this claim.

Petitioner's third claim is that the trial court violated California Penal Code § 1181(6) by failing to reduce his conviction following the jury's verdict, from second degree murder to manslaughter. Pet. at 5, 46-49. As noted above, a writ of habeas corpus may only be granted for violations of federal law. 28 U.S.C. § 2254(a).[3] To the extent petitioner asserts there

---

[2] Page references are to the number assigned by the CM/ECF system.

[3] In his petition for review filed before the California Supreme Court, petitioner also claims the trial court's alleged violation § 1181(6) violated the Due Process Clause of the

4

1  was not sufficient evidence presented to the jury to support a conviction for second degree
2  murder in his third claim, petitioner's argument is addressed below.

3  Petitioner's final claim is that the evidence in support of his conviction for second
4  degree murder is insufficient because there was no evidence that the murder was committed with
5  malice. Pet. at 5, 50; Pet., Part 2 at 1-3. Under <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979), a
6  criminal conviction cannot stand if, after viewing the evidence in the light most favorable to the
7  prosecution, the court finds that no rational trier of fact could have found the essential elements
8  of the crime beyond a reasonable doubt. In California, having "malice aforethought" is an
9  element of second degree murder. Cal. Penal Code § 187(a) & 189. Malice is implied "when no
10 considerable provocation appears, or when the circumstances attending the killing show an
11 abandoned and malignant heart." <u>People v. Dellinger</u>, 49 Cal.3d 1212, 1217 (Cal. 1989). Malice
12 does not exist if the evidence shows the killing occurred upon a sudden quarrel or in the heat of
13 passion. Cal. Penal Code § 192(a). Also, malice does not exist if the evidence shows the killer
14 held an honest but unreasonable belief in the need to defend against imminent peril to life or
15 great bodily harm. People v. Flannel, 25 Cal. 3d 668, 672 (Cal. 1979).

16 On direct appeal, the California Court of Appeal summarized the facts presented
17 at petitioner's trial as follows:

> In August 2002, defendant, his cousin, Michael Anderson [footnote omitted], Michael's brother, Walter, Walter's girlfriend, Candy Johnson, and Michael's cousin, Russell, were living at Michael's grandmother's house on Third Avenue [in Sacramento]. Michael had moved from Saint Louis in March or April. In Saint Louis, Michael belonged to the Crip gang.

---

Fourteenth Amendment. <u>See</u> Pet. at 46-47 (attaching copy of state court record). Petitioner did not raise this claim in the petition before this court. <u>Id</u>. at 5, 7. In any case, petitioner fails to point to any United States Supreme Court authority which stands for the proposition that he has a due process right under any circumstances to have his conviction reduced to a lesser offense by a trial judge if there is sufficient evidence to support the finding made by the jury. Therefore, even if petitioner had raised his due process claim here, he has not shown the claim is not barred by 28 U.S.C. § 2254(d).

5

One month before the charged murder, Matthew, a friend of Russell, was visiting the grandmother's house wearing a shirt that Michael thought belonged to him. Matthew was a member of the Blood gang. After an argument, Matthew gave the shirt to Michael. Michael's shirt was later found in the grandmother's house and Michael apologized to Matthew. Despite the apology, the two became embroiled in a heated argument during which Michael pushed Matthew in his face. In response, Matthew told Michael, "Blood, I'm going to get my brother, Blood. I'm going to get my brother, Blood."

Matthew returned five to ten minutes later with an older Blood member, Dedrick. According to Michael, Dedrick challenged Michael to a fight but Walter, who was also a Blood, intervened.

Ten to forty-five minutes after Dedrick left, Corey Coleman arrived at the grandmother's house. In a calm, polite, and friendly manner, Coleman spoke to Michael and Walter about the shirt incident, trying to settle the matter. Coleman shook Michael's hand at the end of the conversation.

On August 15, 2002, at approximately 8:30 p.m., defendant and Michael went to the Washington Market, a few blocks from their grandmother's house, to buy beer. In the store, they were approached by Coleman, who appeared a little angry. Coleman asked defendant and Michael who they were and where they were from. Michael responded, "Saint Louis." Coleman persisted in his questions, asking what Michael "claimed" and what he was doing in the store. [Footnote omitted.] Michael said that he did not claim a gang and asked Coleman why he was "tripping." The two argued for about 30 seconds. Michael then turned his back to Colman and called his sister-in-law on his cellular phone while walking toward the counter. Coleman asked Michael if he was trying to call other people. Coleman grabbed Michael's collar, spun him on the counter, and hit him on the right side of the his face. Michael landed in the potato chip stand. Coleman was standing or bending over him.

According to the market owner, defendant fired one shot at Coleman while standing face to face with him. Coleman stepped back. There was a pause of about two to three seconds after the first shot and then defendant fired a second shot. After another second or two, he fired a third shot. Coleman turned around and walked to the back of the market, hiding behind a candy shelf, and then fell.[Fn]

Coleman sustained three gunshot wounds, although the pathologist could not determine in what order the shots were fired. One gunshot entered the right middle finger on the palm side of Coleman's hand. Coleman had a black smudge on the palm side of his hand, indicating the gun was fired within a few inches of

6

Coleman's hand. Another shot entered the middle of Coleman's left chest. There was no soot on this wound and no indication of the distance from which the gun was fired to cause this wound. This wound was treatable. It could not have been inflicted when Coleman had his back to defendant, but could have been inflicted when defendant was facing Coleman. Another shot entered Coleman's right upper back. This bullet perforated his right lung, struck the back surface of the pericardial sac around the heart, hit the main artery that leaves the heart, and stopped in the left lung. This bullet killed Coleman.

When Michael heard the three gunshots, he ran out of the store, back to his grandmother's house. Defendant was running behind him. Michael suffered a "fat lip" and scratches on his knee from the potato chip stand.

The morning after the shooting, defendant and Michael went to Winters to stay with Candy Johnson's aunt. When defendant and Michael were leaving Winters, police pulled them over and Michael gave them a false name.

At trial, Michael testified that he knew Coleman by the nickname of "CK," meaning "Crip Killer," and believed Coleman was a Blood with a reputation for carrying guns. In an interview with homicide detective Michael Poroli on August 17, 2002, Michael initially said that he did not know the decedent's name and had never seen him before. Toward the end of the interview, Michael recalled that he had seen "Corey" once before talking to his brother "Wally." At trial, Michael testified that he did not tell the detective about his knowledge of Coleman's involvement in the gang because the detective did not ask and he (Michael) did not think the situation was over gang issues at the time.

Michael further testified that he was not afraid to be in the neighborhood, did not feel threatened in any way in between the time of the shirt incident and the shooting, and did not carry a gun because he had no reason to think he needed one. He was "very surprised" by Coleman's behavior at the market and thought Coleman was "cool" with his brothers.

In front of the jury, the court took judicial notice of Michael's testimony at a hearing on January 15, 2004, in which he recounted that defendant said he needed to carry a strap with him in case someone tried to get him.

Michael further recounted that he and defendant felt really threatened because it was a Blood neighborhood and he was from out of town.

At trial, Candy Johnson testified that when defendant and Michael returned from the market, defendant told Walter that Michael had

7

gotten into it with Colman and referred to Coleman as "C.K." Johnson also testified that a few weeks after the shirt incident, but before the shooting, she heard defendant tell Walter that Dedrick had threatened to shoot him.

Homicide detective Marnie Stigerts interviewed Johnson a few days after the shooting. Johnson never stated that Coleman was known as a "Crip Killer" or that he was involved in a gang. Johnson described a conversation she heard between defendant and Walter in which defendant said he had told Dedrick, "Nigger, if you want to handle it, come on, you know. I ain't scared, you know. I'm from St. Louis. And get – niggers like us, we get down, you know. Yeah, I ain't scared. I ain't scared. . . . I'll bast you. I'll blast all y'all in y'all face, you know. I ain't scared."

---

[Fn] The incident was captured on the market's surveillance camera. The tape was played for the jury as part of the People's case in chief. According to the trial judge, the tape and photos made from the tape show that defendant continued shooting while Michael was heading toward the door.

Pet. at 27-31.

The Court of Appeal found as follows with respect to whether petitioner's shooting of Corey Coleman was accompanied by malice:

> There was substantial evidence from which the jury could conclude that defendant acted deliberately with malice when shooting Coleman. While Michael testified in a proceeding before trial that he and defendant felt threatened because it was a Blood neighborhood, Michael testified at trial that he was not afraid to be in the neighborhood and did not feel threatened in any way in between the time of the shirt incident and the shooting. He was "very surprised" by Coleman's behavior at that market and thought that Coleman was "cool" with his brothers. Moreover, while Michael testified at trial to Coleman's reputation as a Blood who carried guns, he never referenced this knowledge during the police interview two days after the shooting and testified at trial that he did not think the situation was over gang issues at the time. Similarly, while Candy Johnson testified that defendant referred to Coleman as a "Crip Killer" when he returned from the shooting, she never told the police detective this when she was interviewed shortly after the shooting.

/////

/////

> There was also evidence that before the shooting, defendant had told Dedrick that he was not scared and that he would blast "y'all" in the face. Indeed, according to Michael, defendant told him that he needed to carry a strap with him in case someone tried to get him.
>
> The number of shots fired and the location of Coleman's wounds also supports the jury's verdict that defendant killed Coleman with malice. (*People v. Gaulden* (1974) 36 Cal.App.3d 942, 952.) The market owner and Michael both heard three gunshots. Although the pathologist could not determine the order in which the shots were fired, the jury could have determined that defendant fired the fatal gunshot after the other two given the fact that this gunshot entered Coleman's back and defendant fired the first shot while facing Coleman. Moreover, the court stated that the tape and photos of the shooting show that Michael had moved away and was heading toward the door but defendant kept shooting.

Id. at 37-39.

        The California Court of Appeal's decision regarding petitioner's insufficiency of evidence claim is not contrary to, nor does it involve an unreasonable application of law clearly established by the Supreme Court of the United States. Furthermore, the decision is not based upon an unreasonable interpretation of the facts. Having heard and considered all the evidence, including petitioner's explanation at one point that he was acting in self defense, a rational trier of fact could have found beyond a reasonable doubt, as determined by the Court of Appeal, that petitioner acted with malice so as to support a conviction of second degree murder. Therefore, petitioner is precluded from obtaining relief as to his insufficiency of the evidence claim under 28 U.S.C. § 2254(d).

        For all the foregoing reasons, the court will recommend that petitioner's application for writ of habeas corpus be denied.

        Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

        These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty days after being served with these findings and recommendations, any party may file written

1  objections with the court and serve a copy on all parties.  Such a document should be captioned
2  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections
3  shall be served and filed within ten days after service of the objections.  The parties are advised
4  that failure to file objections within the specified time may waive the right to appeal the District
5  Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).
6  DATED: September 25, 2008.

_____
U.S. MAGISTRATE JUDGE

1/pw
ande1609.157